EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Iris Meléndez Vega | |
| Peticionaria | |
| | Certiorari |
| v. | |
| | 2000 TSPR 101 |
| Caribbean International News, | |
| Gaspar Roca, José A. Purcell, etc. | |
| Recurridos | |

Número del Caso: CC-2000-0275

Fecha: 29/junio/2000

Tribunal de Circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Héctor Urgell Cuevas

Abogados de la Parte Peticionaria:

        Lcdo. José J. Alvarez González
        Lcda. Maricarmen Ramos de Szendrey

Abogados de la Parte Recurrida:

        Lcdo. Juan R. Marchand Quintero
        Lcdo. Francisco Ortiz Santini

Abogados de Martha Marrero:

        Lcdo. José Juan Nazario de la Rosa
        Lcdo. Juan E. Santiago Nieves

Abogados de Héctor Santiago Rivera:

        Lcdo. Héctor Santiago Rivera
        Lcda. Sandra Santiago Rivera
        Lcdo. Edwin Santiago Rivera

Materia: Acción Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Iris Meléndez Vega

    Peticionaria

       v.

                     CC-2000-275

Caribbean International News,
Gaspar Roca, José A. Purcell
y otros

    Recurridos

Opinión del Tribunal emitida por la Jueza Asociada señora NAVEIRA DE RODÓN

San Juan, Puerto Rico a 29 de junio de 2000

    Mediante el presente recurso la peticionaria, la Fiscal Iris Meléndez Vega (en adelante la Fiscal Meléndez), nos solicita revoquemos la sentencia emitida el 14 de marzo de 2000 por el Tribunal de Circuito de Apelaciones y, en consecuencia, que reinstalemos la determinación del Tribunal de Primera Instancia, Sala de San Juan, mediante la cual se descalificó al Lcdo. Juan R. Marchand Quintero como representante de la parte demandada recurrida, Caribbean International News Corporation, Gaspar Roca y José A. Purcell (en adelante El

Vocero).   Los hechos pertinentes a la resolución del presente caso son sencillos y no están en controversia.

I

La descalificación del licenciado Marchand Quintero ocurrió en un caso de daños y perjuicios por libelo y difamación instado por la Fiscal Meléndez contra El Vocero de Puerto Rico y otros, Civil Núm. KDP-92-0574. El litigio entre las partes en este caso ha sido intenso y extenso.   Distintos incidentes procesales del pleito han sido objeto de diversos recursos ante el Tribunal de Circuito de Apelaciones y ante este Tribunal.   Desde sus inicios en el 1992, han comparecido en representación del Vocero **dos abogados**: el Lcdo. Juan R. Marchand Quintero y el Lcdo. Francisco Ortiz Santini.

En los casi **ocho (8) años** que lleva pendiente de resolución ante el foro de instancia, el caso ha sido objeto de varias reasignaciones a distintos jueces debido a inhibiciones o problemas de calendario.   En vista de ello, el 26 de enero de 2000 el Honorable Carlos Rivera Martínez, Juez Administrador del Centro Judicial de San Juan asignó el caso mediante orden administrativa al Honorable Víctor M. Rivera González. Hasta ese momento **habían intervenido un total de seis (6) jueces y un (1) Comisionado Especial**.   Este último fue designado en 1998 para recibir la extensa prueba

anunciada por las partes. A nivel de tribunal de instancia, **tres (3) de los jueces se inhibieron**.

Los incidentes que llegaron al Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito) también tuvieron que ser reasignados en numerosas ocasiones antes de ser resueltos. En dicho tribunal la mayoría de las reasignaciones respondieron a la inhibición, motu proprio o a solicitud de recusación incoada por el licenciado Marchand Quintero, de diversos magistrados. En total, en dicho foro hay cuatro (4) paneles íntegros que no participan en los incidentes relacionados al caso y por lo menos **diez (10) jueces individuales inhibidos**.

Al día siguiente de serle asignado el caso en el tribunal de instancia, al Hon. Rivera González, éste diligentemente coordinó por teléfono una reunión con los abogados de las partes. La convocó a los fines de evaluar "…si todavía tenía vigencia cualquier oferta transaccional o, en la alternativa, señalar el comienzo del juicio en las próximas dos semanas". Se pautó la reunión para el 1 de febrero de 2000 a las 4:00 P.M.

Llegado el día de la reunión, un par de horas antes de celebrarse ésta, el licenciado Marchand Quintero llamó a la oficina del Honorable Rivera González. Esto ocurrió aproximadamente a las 12:30 del mediodía. El Juez no se encontraba en ese momento. El licenciado Marchand Quintero dejó un mensaje con la secretaria

expresando que le urgía comunicarse con el magistrado antes de la reunión pautada para ese día a las 4:00 P.M. Poco después de la 1:00 de la tarde, el Honorable Rivera González devolvió la llamada al licenciado Marchand Quintero. La subsiguiente conversación entre el letrado y el Juez es la que provoca la descalificación cuya validez examinamos en el presente recurso.

Al contestar el teléfono, el licenciado Marchand Quintero comenzó por decirle al Juez Rivera González que "no sabía cómo expresarle algo, que antes le había sucedido con otro Juez" [1]; que se le había hecho difícil comunicárselo y que no quería que le cogiera "en frío" durante la vista. Expresó entonces el letrado al Juez Rivera González que cuando informó a su cliente, el señor Gaspar Roca, presidente de El Vocero, que el caso había sido asignado a su cargo, el señor Roca le indicó, "espérate un segundito, hablamos después, porque creo que tengo algo". El señor Roca quedó en que cotejaría y luego le informaría.

Continuó el licenciado Marchand Quintero relatando al Juez que el señor Roca le informó que sus ejecutorias judiciales en la Sala de lo Criminal durante los años 1998 y 1999 eran objeto de una investigación por parte del periódico. Añadió, que ya tenían una declaración jurada. Prosiguió el letrado expresando al Juez que, tras recibir la información del señor Roca, se había

comunicado personalmente con los investigadores del Vocero y que éstos eran ex agentes del Negociado Especial de Investigaciones. Alegadamente los investigadores le informaron que "la investigación estaba caminando" y que ya tenían documentos, entrevistas y fuentes informativas.

Acto seguido, el Juez Rivera González le indicó al licenciado Marchand Quintero sentirse agobiado y le expresó lo siguiente: "Mire Lcdo., déjeme utilizar una expresión bien puertorriqueña: Ay bendito, yo nunca he utilizado mi puesto para algo ilegal o impropio" e **invitó al licenciado Marchand Quintero a que planteara lo que le había expresado vía telefónica en la reunión que se celebraría ese mismo día a las 4:00 P.M.** Entonces, el licenciado Marchand Quintero expresó al magistrado que le preocupaba que durante el trámite del caso surgieran artículos periodísticos. Según el letrado, esto lo pondría a él en una posición difícil la cual describió de la siguiente manera:

> Primero, por haber gente que sabe que se está investigando, el no publicarse nada, con el devenir del tiempo podría interpretarse como que de alguna forma El Vocero ha tratado con manos de seda o, ¡vamos!, con algún propósito malo de aventajarse. Y por el contrario, si estuviese el caso activo ante usted y decidiesen publicar lo que sea que decidan publicar, pues, la gente va a pensar, incluyendo obviamente a la parte demandante y su distinguida representación, van a pensar que lo que estamos haciendo es de alguna forma

---

[1]  Se refería al Hon. Ángel G. Hermida Nadal.

palanqueando el criterio profesional de Vuestro Honor.

En fin, la preocupación del letrado se fundaba en que tanto la publicación, como la no publicación de los artículos, presumiblemente peyorativos, que pudieran resultar de la investigación podría interpretarse de forma impropia. Al parecer, el licenciado entendió que los actos **de su cliente**, El Vocero, en ejercicio de la libertad de prensa, le son imputables a él como alguna forma de conducta impropia o contraria a los Cánones de Ética Profesional.

Luego de señalar al Honorable Rivera González los detalles sobre la investigación que El Vocero alegadamente conducía en torno a sus ejecutorias y de hacer referencia a los artículos que probablemente resultarían de ella, el licenciado Marchand Quintero reveló al magistrado que la comunicación pretendía **prevenir al Juez de que solicitarían formalmente su recusación de conformidad con la Regla 63 de Procedimiento Civil** 32 L.P.R.A. Ap. III.

A la 4:10 de la tarde se celebró la reunión en el salón de sesiones y, según le había anticipado, el Juez Rivera González invitó al licenciado Marchand Quintero a que expresara para récord lo que previamente le había comunicado por teléfono. **Además, lo exhortó a que solicitara un remedio si entendía que era adecuado**. El

licenciado Marchand Quintero accedió a la invitación resumiendo para el récord el incidente telefónico.

El Juez, por su parte, añadió algunos detalles a la versión del licenciado, los cuales este último admitió eran acertados. El Juez manifestó que, aunque carecía de jurisdicción para valorar si la comunicación ex parte del letrado implicaba una violación de carácter ético, entendía que ésta, por su contenido, podría tener una "un grado mayor de impropiedad". Añadió que la comunicación del letrado inclusive podía entenderse como que "en alguna forma bordea[ba] en ilicitud" en virtud de lo dispuesto por el Art. 247 del Código Penal, 33 L.P.R.A. sec. 4443, que establece como delito grave la pretensión de influir en un Juez mediante amenazas o por medio de persuasión.

Acto seguido, el Juez ordenó la transcripción de los procedimientos y dispuso que se remitieran a la consideración del Tribunal Supremo para la evaluación de las implicaciones éticas que pudiera tener la comunicación ex parte del licenciado Marchand Quintero.[2] **Además, el magistrado descalificó al letrado como abogado de El Vocero en el caso**. Finalmente, **indicó que no iba a inhibirse en el caso** pues no tenía prejuicio

---

[2] Una vez recibida la transcripción de los procedimientos, siguiendo el trámite ordinario, este Tribunal refirió el expediente del caso de conducta profesional a la consideración del Procurador General para la investigación y preparación del correspondiente informe.

personal ni judicial en cuanto a los hechos del caso, las partes o los litigantes.

Por su parte, el licenciado Marchand Quintero expresó que la manifestación telefónica había sido "una simple cortesía" y no "una amenaza". El Honorable Rivera González señaló que entendía que, **dentro de la totalidad de las circunstancias**, el acercamiento "ex parte" no constituía una deferencia.

El 3 de febrero, el Honorable Rivera González emitió una resolución donde recogió las consideraciones de hecho y fundamentos de derecho que lo llevaron a ordenar la descalificación. En la referida resolución **aclaró que retenía al licenciado Francisco Ortiz como abogado de El Vocero**. Cabe destacar que este último labora para el licenciado Marchand Quintero y ha firmado casi todos los documentos que obran en autos incluyendo un informe con antelación al juicio de cincuenta (50) páginas.

Con relación a la descalificación del licenciado Marchand Quintero, el Juez explicó que la decretó **como una medida preventiva a los fines de continuar el trámite en el caso y de preservar su independencia como juzgador**. Se desprende de la resolución, que el Juzgador ofreció especial consideración a la crítica situación de retraso causada por el patrón de inhibiciones de jueces ocurridas durante el trámite del caso.

El 16 de febrero, El Vocero presentó petición de _certiorari_ ante el Tribunal de Circuito en la cual planteó que había errado el tribunal de instancia al decretar sumariamente y en corte abierta la descalificación del licenciado Marchand Quintero para continuar representándolos. En esa misma fecha, el foro apelativo intermedio emitió una resolución ordenando la paralización de los procedimientos ante el Tribunal de Primera Instancia y concedió un término de diez (10) días para que cualquier parte interesada se expresase respecto al recurso.

El 14 de marzo el Tribunal de Circuito dictó una sentencia mediante la cual revocó la descalificación decretada por el tribunal de instancia. Dicho foro resolvió que la descalificación no se justificaba en los méritos. Además, concluyó que el tribunal de instancia violó el debido proceso de ley tanto del letrado, como de sus representados.

Inconforme, la Fiscal Meléndez acudió ante nos Solicitó la revocación de la sentencia del Tribunal de Circuito y la reinstalación de la orden de descalificación.[3]

---

[3] Los errores planteados leen como sigue:

A. ERRÓ EL TRIBUNAL DE CIRCUITO DE APELACIONES AL RECONOCER GARANTIAS DE DEBIDO PROCEDIMIENTO DE LEY ENTERAMENTE INAPLICABLES AL INCIDENTE DE DESCALIFICACIÓN ANTE SI, CONCLUYENDO ERRÓNEAMENTE QUE HUBO PRIVACIÓN DE DERECHOS CONSTITUCIONALES DE LOS RECURRIDOS Y SU ABOGADO.

La adecuada solución del presente caso requiere dilucidemos dos controversias. En primer lugar, debemos determinar si las actuaciones del licenciado Marchand Quintero justificaban, en los méritos, una orden de descalificación. En segundo lugar, nos toca analizar la suficiencia de las garantías procesales otorgadas al letrado antes del decreto de descalificación. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

II

El Tribunal de Circuito resolvió que los actos del licenciado Marchand Quintero no justificaban, en los méritos, una descalificación. Expresó dicho foro que el mecanismo apropiado para canalizar el incidente antes relatado hubiese sido instar un proceso disciplinario contra el abogado. Interpretó, que solo puede utilizarse el mecanismo de la descalificación para evitar que los abogados incurran en conflictos de intereses. Erró el Tribunal de Circuito en su interpretación.

De entrada debemos aclarar que un acercamiento ex parte de un abogado a un juez, en teoría, podría dar

---

B. ERRÓ EL TRIBUNAL DE CIRCUITO DE APELACIONES AL RESOLVER QUE LOS HECHOS DEL CASO Y LA DOCTRINA RELACIONADA NO REQUERÍAN LA DESCALIFICACIÓN DECRETADA DEL LCDO. JUAN R. MARCHAND QUINTERO.

lugar a tres (3) tipos de procedimientos distintos dependiendo del contenido y gravedad de la comunicación. Estos son: (i) una descalificación; (ii) un procedimiento disciplinario por violación a los Cánones de Ética; y (iii) un proceso criminal por violación al Art. 247 del Código Penal. Para los efectos del presente caso, solo resulta relevante examinar los hechos bajo la primera figura: la descalificación.

Los procedimientos de descalificación **no constituyen acciones disciplinarias**. Por el contrario, hemos reconocido la descalificación "como una **medida preventiva** para evitar posibles violaciones a los Cánones de Ética Profesional." Véase K-Mart Corp. v. Walgreens of P.R., Inc., 121 DPR 633, 637-638 (1988). A ello responde que, en el ejercicio de su poder inherente para tomar medidas dirigidas a supervisar y controlar la conducta de los abogados que postulan ante sí, los tribunales de primera instancia pueden descalificar abogados sin menoscabar nuestra jurisdicción original y exclusiva para entender en acciones disciplinarias. Véase, Id. a las págs. 637-638 (1988).

Los tribunales pueden utilizar la descalificación, **además**, como mecanismo para asegurar la adecuada marcha de un litigio. Basados en el deber de mantener el orden y el control de los procedimientos que se ventilan ante ellos, los tribunales inferiores tienen la facultad de descalificar abogados para evitar "actos disruptivos" de

éstos.    Dicho  de  otro  modo,  al  manejar  los
procedimientos  en  un  caso,  el  juez  tiene  la  potestad  de
descalificar  a  un  abogado  si  ello  resulta  necesario  para
el  logro  del  objetivo  primordial  de  todo  tribunal:  la
solución  justa,  rápida  y  económica  de  los  pleitos.
Véase  la  Regla  1  de  Procedimiento  Civil,  32  L.P.R.A.  Ap.
III.   Del  mismo  modo,  el  juez  puede  denegar  una
solicitud  de  descalificación  presentada  por  una  parte
adversa,  cuando  entienda  que  la  misma  se  ha  interpuesto
como  una  táctica  dilatoria  del  procedimiento.

Así  pues,  la  utilización  del  mecanismo  de  la
descalificación  no  se  limita,  como  sostiene  El  Vocero,  a
evitar  violaciones  del  Canon  XX  de  Ética  Profesional,  4
L.P.R.A.  Ap.  IX.   La  descalificación  puede  otorgarse
fundamentada  en  una  de  dos  situaciones:  (i)  prevenir  una
violación  a  **cualquiera**  de  los  Cánones  de  Ética
Profesional;  o  (ii)  para  evitar  **actos  disruptivos**  de  los
abogados  durante  el  trámite  de  un  pleito.

Los  tribunales  de  instancia  tienen  la  facultad  de
ordenar  motu  proprio  la  descalificación  de  un  abogado.
También  pueden  otorgar  la  misma  accediendo  a  una
solicitud  de  parte.   En  Otaño  v.  Vélez,  Op.  de  30  de
octubre  de  1996,  141  D.P.R.  (1996),  96  J.T.S.  142  a  la
pág.  280,  distinguimos  la  primera  situación  de  la
segunda.[4]  Con  relación  a  la  descalificación  **motu  proprio**,

---

[4]    En  el  segundo  supuesto,  esto  es,  en  las  situaciones
donde  la  parte  contraria  solicita  la  descalificación,  el

que es la que nos atañe, allí expresamos que cuando el tribunal dicta la descalificación bajo estas circunstancias, no es necesario que se aporte prueba sobre una violación ética, ya que **la apariencia de impropiedad podrá ser utilizada, en caso de duda, a favor de la descalificación**. <u>Liquilux Gas Corp.</u> v. <u>Berríos, Zaragoza</u>, Op. de 30 junio de 1995, 138 D.P.R. ___ (1995), 95 JTS 92 a la pág. 1039. Véase, además, <u>In re: Carreras Rovira y Suárez Zayas</u>, 115 D.P.R. 778 (1984). Cuando la orden de descalificación responde a la necesidad del juez de agilizar el tramite de un pleito, tampoco será estrictamente necesario que éste reciba prueba adicional. No debe perderse de vista que en estos casos, de ordinario, las circunstancias que motivan el dictamen han ocurrido en su presencia.

En suma, al examinar en lo sustantivo la procedencia de una descalificación, procede hacer **un análisis de la**

---

tribunal deberá considerar los siguientes factores: (i) si quien solicita la descalificación tiene legitimación activa para invocarla;(ii) la gravedad de la posible violación ética involucrada; (iii) la complejidad del derecho o los hechos pertinentes a la controversia y el "expertise" de los abogados envueltos; (iv) la etapa de los procedimientos en que surja la controversia sobre descalificación y su posible efecto en cuanto a la solución justa, rápida y económica del caso; y (v) el propósito detrás de la descalificación, es decir, si la moción está siendo utilizada como mecanismo para dilatar los procedimientos. Véase <u>Otaño</u> v. <u>Vélez</u>, supra, a la pág 280.

En suma, al examinar en lo sustantivo la procedencia de una descalificación, procede hacer **un análisis de la totalidad de las circunstancias** sopesando los criterios antes enumerados.

**totalidad de las circunstancias** para valorar si la actuación del abogado constituye un "acto disruptivo" o si tiene el potencial de desembocar en una violación de los Cánones de Ética Profesional. Examinemos los hechos ante nos.

En el caso de autos, el Tribunal de Primera Instancia consideró que el acercamiento del abogado mediante la comunicación telefónica fue "poco prudente". El Juez Rivera González, quién fue el recipiente de las expresiones del licenciado Marchand Quintero, las percibió "como una intervención indebida en la función judicial". Interpretó el Juez que no se trataba de una simple cortesía del letrado, sino más bien y en el mejor de los casos, de una **comunicación ex parte dirigida a provocar su inhibición voluntaria. Además, el Juez percibió que dicho acercamiento le podría desarrollar algún grado de aprehensión ante la futura conducta del abogado**.[5]

---

[5] En In re Rivera Cruz, 126 D.P.R. 768 (1990)(Resolución) este Tribunal examinó hechos muy similares a los de autos. El entonces Secretario de Justicia, Lcdo. Héctor Rivera Cruz, envió un mensaje a un juez a través del Juez Administrador del Tribunal a los efectos de que se proponía solicitar su recusación. En aquella ocasión este Tribunal declinó ejercer su jurisdicción **disciplinaria** con relación al letrado. Ello, sin embargo, no es óbice para sostener los méritos de la descalificación ante nos. Aunque la conducta del licenciado Marchand Quintero no llegase a configurar una violación ética, cosa sobre la cual no estamos pasando juicio, podría resultar suficiente para sostener una descalificación.

El Juez consideró tanto el amplio patrón de inhibiciones en el presente caso, como el considerable atraso que lleva el mismo. Por ello, estimó prudente la descalificación como un mecanismo efectivo de manejo del caso que adelantaría su resolución. Además, pesó en su ánimo el hecho que El Vocero no quedaría en estado de indefensión pues le permitió al licenciado Ortiz Santini continuar a cargo del caso. El Juez entendió que, de permitirle al licenciado Marchand Quintero continuar en el caso, su conducta tenía el potencial de tornarse contraria a los Cánones de Ética Profesional.

Al explicar los factores considerados en su decisión, el Juez expresó lo siguiente en la Resolución de Descalificación:

> Las interpretaciones, correctas o equivocadas, en muchas ocasiones son el resultado de eventos anteriores y posteriores al evento concomitante.
>
> **No podemos pasar por alto que varios compañeros jueces y juezas se han inhibido** de presidir en este caso y que una de las juezas fue objeto de varias publicaciones en el periódico El Vocero, donde criticaban su gestión judicial, y que con posterioridad se inhibió de continuar presidiendo el caso.
>
> Descifrar la intención de la llamada, esto es, qué perseguía la misma, es más que un ejercicio jurídico uno de lógica, sentido común y conocimiento de la intringulis de la litigación puertorriqueña. Además, si la conducta del licenciado Marchand Quintero fue correcta o entraña algún grado de violación ética, es asunto sobre el cual no tenemos competencia investigativa.

> **Es suficiente la duda que nos surge para considerar prudente la descalificación del compañero abogado**. De continuar el licenciado Marchand Quintero representando a la parte codemandada, **se dificultaría el manejo del caso y el juez suscribiente pudiera desarrollar algún grado de aprehensión sobre la conducta de este abogado litigante**. (Énfasis nuestro.)

Ante **la totalidad de las circunstancias** en este caso, la determinación tomada por el Tribunal de Primera Instancia nos parece acertada. Entendemos que quién está en mejor posición para determinar las implicaciones que el acercamiento ex parte del licenciado Marchand Quintero tiene para el curso del pleito es el propio Juez Rivera González. Éste recibió la llamada y tuvo la oportunidad de escuchar de primera mano la totalidad de la conversación.

Determinar la intención de la llamada y si ésta constituye una base adecuada para la descalificación conlleva un ejercicio de determinación mixta de hecho y de derecho. En cuanto a las determinaciones de hecho y adjudicación de credibilidad de un tribunal de instancia, reiteradamente hemos resuelto que, como norma general, no intervendremos con éstas en ausencia de error manifiesto, pasión, prejuicio o parcialidad. Véanse, Quiñones López v. Manzano Pozas, res el 25 de junio de 1996, 141 D.P.R.____ (1995), 96 J.T.S. 95; Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984); y

Ramos Acosta v. Caparra Dairy, Inc., 113 D.P.R. 357 (1982).

En lo que respecta a la determinación de derecho que hace el tribunal de instancia al descalificar, se trata de una decisión impregnada del alto grado de discreción que tiene dicho foro en el manejo procesal de un caso. Como es sabido, los tribunales apelativos no debemos, con relación a determinaciones interlocutorias discrecionales procesales, sustituir nuestro criterio por el ejercicio de discreción del tribunal de instancia, salvo cuando dicho foro haya incurrido en arbitrariedad o craso abuso de discreción. Véanse, Lluch v. España Service Sta., 117 D.P.R. 729, 745 (1986); Valencia, Ex Parte, 116 D.P.R. 909, 913 (1986); Ortiz Rivera v. Agostini, 92 D.P.R. 187, 193 (1965). Especialmente cuando, como en el caso de autos, tanto el juez como la parte están de acuerdo con los hechos materiales relatados en la resolución de descalificación.

En vista de lo anterior, este Tribunal tendría facultad para revisar la determinación en los méritos de una descalificación en casos como el presente, solo cuando el tribunal inferior **abuse de su discreción**. Examinados los hechos particulares de este caso, resolvemos que el Juez Rivera González no abusó de su discreción.

Se trata de un caso que al momento de la descalificación llevaba ocho (8) años pendiente ante el foro de instancia sin que la parte demandante hubiese logrado tener su día en corte. En el trámite del mismo un total de trece jueces (13) se inhibieron motu proprio. El licenciado Marchand Quintero presentó solicitud de recusación para lograr la inhibición de otros tres (3) jueces, entre ellos el Juez Rivera González.[6] Notamos que en cada una de las ocasiones en que El Vocero presentó una recusación, ésta se fundamentaba en que el periódico investigaba o había publicado artículos criticando la conducta del juez

---

[6] El 24 de abril de 1995 el licenciado Marchand Quintero promovió una solicitud de recusación del Hon. Gustavo Rodríguez en el recurso KLCE-95-00036 Iris Meléndez Vega v. El Vocero y otros. El fundamento fue la publicación en agosto de 1992 de dos noticias sobre la conducta del magistrado cuando ejercía la abogacía. La moción logró provocar la inhibición voluntaria del Juez, ya que este accedió a la solicitud sin ulterior trámite.

El 8 de octubre el licenciado Marchand Quintero promovió una solicitud de recusación de la Hon. Jocelyn López Vilanova en el recurso KLCE9800977, Iris Meléndez Vega v. El Vocero y otros. Una vez más el fundamento fue que el Vocero publicó "multiples noticias" sobre la jueza dos años antes, esto es, "durante gran parte del año 1996". Alegadamente trataban de "conducta sumamente impropia" de la misma. Al momento de presentar la moción el incidente ante el foro apelativo intermedio se había resuelto y dicha determinación había sido confirmada por este Tribunal. La Jueza nunca resolvió la moción.

Finalmente, el licenciado Marchand Quintero presenta una solicitud de recusación contra el Juez Rivera González. Esta vez se fundamentó la solicitud en la existencia de **una investigación** sobre las ejecutorias

recusado. Toda esta información era de conocimiento del licenciado Marchand Quintero al momento de originar la comunicación que provoca su descalificación.

Consciente del escabroso camino recorrido por el pleito, el Juez Rivera González pautó una reunión con los abogados **para un día después de haberle sido asignado el caso**. Un obstáculo no tardó en anteponerse y frustrar los efectos de tan encomiable diligencia. El licenciado Marchand Quintero originó la controversial llamada pocas horas antes de celebrarse la vista pautada. A esto se le añade, que la llamada "cortesía" adelantó información hasta entonces desconocida por el Juez, sobre lo que serían los fundamentos para solicitarle la inhibición. Esto es, hasta ese momento, el Juez no sabía de la investigación, por lo cual no existía base alguna que justificase la presentación de una recusación. Cabe señalar que mero conocimiento de que se lleva a cabo una investigación o de que pudiera llegarse publicar una noticia sobre un juez, de por sí, no puede dar base a su recusación.

Al igual que el juzgador de instancia no hemos podido ignorar el patrón de inhibiciones de varios jueces y juezas a iniciativa propia, algunos luego de solicitarse la recusación. Tampoco hemos podido obviar el patrón de artículos publicados en torno a algunos de

---

y la **"posible"** publicación posterior de artículos al respecto.

los magistrados que han participado en el caso, que también aparentan haber provocado la inhibición de algunos de éstos.[7]

En cuanto al Juez Rivera González, que actualmente tiene a cargo el caso, hemos notado que mientras estaba pendiente el recurso de certiorari ante el Tribunal de Circuito El Vocero publicó una serie de seis (6) artículos en torno a sus ejecutorias. Éstos se publicaron consecutivamente durante los días 28 y 29 de febrero de 2000, 1, 2, 3 y 6 de marzo de 2000. Todos ellos estuvieron ubicados en las primeras diez (10) páginas del diario. El primero de la serie logró la privilegiada posición de primera plana.

En concreto, la totalidad de las imputaciones hechas por la serie de artículos al juez se reducían a haber sido benévolo con ciertos acusados. Cabe destacar que el último artículo de la serie lo utilizó El Vocero para traer ante la opinión pública diversas quejas en torno a las intervenciones del magistrado en casos donde el periódico era parte. Entre otras cosas, El Vocero expresó que "[r]ecientemente, Rivera González no se inhibi[ó] ante una solicitud a esos efectos, en el caso de la fiscal Iris Meléndez contra este diario". De la

---

[7]    La Honorable Gloria M. Iagrossi Brenes se inhibió mediante resolución emitida el 12 de julio de 1999. Ello, luego de que El Vocero comenzara a publicar una serie de cinco (5) artículos sobre supuestos actos indebidos de esta Jueza. Las noticias se publicaron los días 9, 12, 13, 14 y 16 de julio de 1999.

totalidad de las circunstancias surge con meridiana claridad que El Vocero no escatimó esfuerzos para lograr la inhibición de distintos jueces incluyendo al Honorable Rivera González.

Solicitar la inhibición de un juez **<u>sin fundamentos sólidos</u>** para ello, en un litigio con una trayectoria procesal tan accidentada como el presente justificaba la orden de descalificación emitida por el Juez Rivera González en el ejercicio de su discreción en el manejo del caso. Además, desde el punto de vista de la Ética Judicial, el Juez Rivera González tenía el deber de evitar colocarse en una posición en que su imparcialidad pudiera razonablemente ser cuestionada. Véase el Cánon XI de Ética Judicial, supra.

No es una buena práctica llamar por "cortesía" a un magistrado para adelantarle tanto el hecho de que se solicitará una recusación, como los fundamentos para ello. No solo se presta a variadas interpretaciones, sino que circunvala el mecanismo formal dispuesto para ello en la Regla 63 de Procedimiento Civil, supra.

Bajo ningún concepto deben interpretarse nuestras expresiones en este caso como que desalientan la presentación de solicitudes de recusación meritorias. Por el contrario, se alienta a los abogados a que soliciten la recusación cuando existan fundamentos sólidos para ello. Sin embargo, el mecanismo que deben utilizar es el provisto en la Regla 63 de Procedimiento

Civil, supra.  Dicha regla dispone claramente que la solicitud formal de recusación "deberá ser presentada tan pronto el solicitante advenga en conocimiento de la causa de recusación."[8]

Tomando en consideración todo lo antes expresado, y a la luz de la totalidad de las circunstancias en este caso, resolvemos que el Hon. Rivera González no abusó de su discreción al utilizar el mecanismo de la descalificación para evitar que se continuara socavando el principio cardinal de las normas procesales: lograr justicia de forma rápida y económica.[9]

---

[8]    Coincidimos con el Juez Rivera González en que:

No es necesario recurrir a indicarle al juez o anticiparle la existencia de una causa de recusación.  EL solo hecho de adelantar este tipo de información, sin que se haya radicado la moción, puede generar diferentes interpretaciones.

¿Qué se pretende con el adelanto de información que posiblemente pueda utilizarse como base para solicitar la recusación de un juez?

¿Se pretende persuadirlo para que se inhiba a iniciativa propia [aún cuando la recusación como cuestión de derecho resulte inmeritoria]? ¿Puede considerarse lo expresado como una forma de intimidación o amenaza si el juez determina no inhibirse?   ¿Genera este anticipo de información animosidad o agradecimiento hacia quien lo provee?

La contestación inescapable [sic] es que este tipo de acercamiento es poco prudente y que puede considerarse como una intervención indebida en la función judicial[…]

[9]   Al llegar a este resultado no prejuzgamos el caso de conducta profesional que actualmente es objeto de un recurso separado e independiente ante este Foro.

Pasemos ahora a examinar si se le garantizaron al letrado, y a sus representados, los derechos procesales correspondientes.

III

El Tribunal de Circuito resuelve la controversia procesal aplicando a la descalificación, por analogía, las normas sobre el desacato criminal impuesto sumariamente. La analogía entre el desacato criminal impuesto sumariamente y la descalificación de un abogado en un pleito civil resulta inapropiada por las diferencias entre los derechos envueltos en ambas situaciones.

El desacato criminal versa sobre conducta constitutiva de delito la cual podría conllevar hasta pena de reclusión. El interés afectado en el desacato criminal es de incuestionable valor y preeminencia. El interés de un abogado en representar a una parte, o de una parte a ser representada por un abogado en particular no goza de la misma jerarquía; sobre todo en pleitos civiles.

Tampoco pueden aplicarse a casos de descalificación las garantías del debido proceso otorgadas a abogados en procedimientos disciplinarios por violación a los

Tampoco estamos pasando juicio sobre si el patrón de inhibiciones respondió a una estrategia dilatoria

Cánones de Ética Profesional. En estos últimos, el abogado se expone a una sanción o penalidad que podría ir desde una amonestación o suspensión temporera del ejercicio de la profesión, hasta el desaforo y privación permanente de su título. Al igual que en el desacato criminal, son mucho mayores y serias las posibles consecuencias para los derechos del abogado afectado. Recalcamos que la descalificación no es ni una sanción, ni una medida disciplinaria. Se trata de una herramienta para evitar violaciones a los Cánones de Ética o para eliminar "actos disruptivos" que obstaculicen la debida marcha de un litigio.

Al aplicar las garantías del debido procedimiento de ley el Tribunal de Circuito expresa, además, que la descalificación de un abogado implica **derechos fundamentales**, no sólo de éste, sino de su representado. Invoca como apoyo a estas afirmaciones a los casos de Otaño v. Vélez, supra.; Sánchez Acevedo v. E.L.A., 125 D.P.R. 432 (1990); e In re Vélez, 103 D.P.R. 590 (1975). Hemos examinado los casos citados. Ciertamente en ellos se reconoce "el derecho que le asiste a todo ciudadano **de escoger libremente el abogado que lo represente.**" (Énfasis nuestro.). Sin embargo, no hemos encontrado que se califique tal derecho como uno fundamental.

---

premeditada por el licenciado Marchand Quintero.

Por el contrario, en <u>Lizarribar</u> v. <u>Martínez Gelpí</u>, 121 D.P.R. 770,785 (1988), resolvimos expresamente que, en el ámbito de lo civil, "no se reconoce el derecho de asistencia de abogado a los litigantes[…]". Esto es, ni siquiera existe un derecho a tener representación legal durante un pleito civil. Menos aún, por lo tanto, existe un derecho fundamental a estar representado por determinado abogado, o, como en este caso, a estar representado **por más de un abogado simultánemente**. No entendemos la pretensión de elevar la prerrogativa de elegir libremente representación legal dentro de un pleito civil a la categoría de derecho fundamental.

Sin lugar a dudas en <u>Otaño</u> v. <u>Vélez</u>, supra, reconocimos que, conforme al debido proceso de ley, un abogado tiene derecho a ser oído y presentar prueba antes del tribunal resolver una solicitud de descalificación **interpuesta por la parte adversa**. Pero ¿Cuál es la extensión de ese derecho cuando el tribunal descalifica **motu proprio**?

En el caso de autos, los únicos testigos del incidente que provoca la descalificación estuvieron presentes en la vista. Además el Juez advirtió al letrado, **antes de concluir el acercamiento telefónico**, que lo invitaría a vertir para récord su versión de lo acontecido. En la vista, el Juez le otorgó amplia oportunidad tanto para narrar la conversación telefónica, como para pedir "el remedio que entendiera

adecuado". Además, el magistrado expresó en la vista los fundamentos por los cuales procedía la descalificación y dio al licenciado Marchand Quintero la oportunidad de reaccionar a los mismos. La Resolución emitida por escrito fue fiel a los hechos narrados y discutió ampliamente los fundamentos de derecho que llevaron al Juez a descalificar. Finalmente, recalcamos que en este caso tanto el juez como el letrado estaban de acuerdo sobre los hechos y contenido de la llamada telefónica. No habiendo controversia en los hechos en este caso, solo restaba aplicar el derecho.

Ante los hechos particulares de este caso, entendemos que la vista celebrada el 1 de febrero concedió al licenciado Marchand Quintero suficiente oportunidad de ser oído. Erró el Tribunal de Circuito de Apelaciones al definir la extensión y contornos del debido proceso de ley aplicables.

Por último, aclaramos que la mera existencia de una investigación periodística y posible subsiguiente publicación sobre las ejecutorias de un juez no trae, como consecuencia automática, su inhibición voluntaria o mediante solicitud recusación. De otra forma, en teoría, bastaría que un periódico demandado comience una investigación o publique artículos sobre cada juez a cargo de su caso para provocar una serie ininterrumpida de inhibiciones o recusaciones. Ello, hasta que su caso fuese juzgado por el magistrado de su predilección o,

entre otras cosas, hasta que la parte adversa se canse de litigar; o la prueba deje de estar disponible; o se afecte la memoria de los testigos por el paso del tiempo. No son nuevas, aunque si reprobables, las prácticas de ganar un litigio por agotamiento de las partes o testigos, o mediante el llamado "judge shopping". Los jueces, especialmente los de instancia, tienen un deber de evitar que esto suceda.

Por los fundamentos antes expuestos se dictará sentencia revocando la emitida por el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan y se confirma la resolución dictada por el Tribunal de Primera Instancia, Sala de San Juan, ordenando la descalificación del Lcdo. Juan R. Marchand Quintero del caso Civil Núm. K DP92-0574, Iris Meléndez Vega v. El Vocero de Puerto Rico, Inc y otros.

Se dictará sentencia de conformidad.


MIRIAM NAVEIRA DE RODÓN
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Iris Meléndez Vega

     Peticionaria

        v.

                            CC-2000-275

Caribbean International News,
Gaspar Roca, José A. Purcell
y otros

     Recurridos

SENTENCIA

San Juan, Puerto Rico a 29 de junio de 2000

     Por los fundamentos expuestos en la Opinión que antecede, se dicta sentencia revocando la emitida por el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan y se confirma la resolución dictada por el Tribunal de Primera Instancia, Sala de San Juan, ordenando la descalificación del Lcdo. Juan R. Marchand Quintero del caso Civil Núm. K DP92-0574, <u>Iris Meléndez Vega</u> v. <u>El Vocero de Puerto Rico, Inc y otros</u>.

     Notifíquese por fax y vía telefónica.

     Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Corrada del Río disiente con Opinión escrita.
El Juez Asociado señor Rebollo López está inhibido.

                      Isabel Llompart Zeno
                Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Iris Meléndez Vega

    Peticionaria

        v.                          CC-2000-275

Caribbean International News,
Gaspar Roca, José A. Purcell
y Otros

    Recurridos

Opinión Disidente emitida por el Juez Asociado señor Corrada del Río

San Juan de Puerto Rico, 28 de junio de 2000.

Disiento de la Opinión mayoritaria emitida por este Tribunal en el caso de autos, mediante la cual revoca la Sentencia dictada el 14 de mayo de 2000 por el Tribunal de Circuito de Apelaciones,[10] que había dejado sin efecto la descalificación del Lcdo. Juan R. Marchand Quintero en el caso Civil Núm. KDP92-0574, *Iris Meléndez Vega v. El Vocero de Puerto Rico, Inc. y otros*. Este Tribunal, al confirmar el dictamen del Tribunal de Primera Instancia, mediante el cual se descalificó al Lcdo. Marchand Quintero de representar a El Vocero

---

[10] Panel integrado por su presidente, Juez Urgell Cuebas, y los jueces Cordero Peña y Gierbolini.

de Puerto Rico, Inc., sin justificación alguna, ha privado a esa parte del derecho que le asiste de escoger libremente el abogado que la represente.

I

Los hechos que dan lugar a este recurso están adecuadamente resumidos en la Sentencia del Tribunal de Circuito de Apelaciones.

El 21 de mayo de 1999 en los recursos consolidados KLCE9901243, KLCE9901244 y KLCE9901245 el Tribunal de Circuito de Apelaciones emitió una Sentencia revocando la "Sentencia Parcial" dictada por el Tribunal de Primera Instancia que acogió a su vez una recomendación de un Comisionado Especial y se devolvió el caso al foro recurrido para que los procedimientos continuasen conforme a lo allí dispuesto.

Una vez advino final y firme dicha Sentencia, el caso fue objeto de varias reasignaciones a distintos jueces del Tribunal de Primera Instancia, debido a inhibiciones o problemas de calendario de éstos. Eventualmente fue asignado al Hon. Víctor M. Rivera González por el Juez Administrador del Centro Judicial de San Juan, mediante Orden Administrativa de 26 de enero de 2000. El 27 de enero, por la vía telefónica, el juez coordinó con los abogados de las partes una reunión informal con el propósito de fijar el trámite procesal a seguir en el caso y, además, explorar o considerar una transacción en el mismo. La reunión se pautó para tener lugar el 1ro. de febrero, a las 4:00 p.m. en el tribunal.

Ese día 1ro. de febrero, de acuerdo a lo expuesto por el Lcdo. Marchand Quintero, éste fue informado por la División de Investigaciones Editoriales del Periódico El Vocero que ésta llevaba varios meses efectuando una investigación periodística en torno a las ejecutorias del Hon. Rivera González como Juez Superior. Al conocer de la existencia de la referida investigación periodística, en o alrededor del mediodía del 1ro. de febrero, el Lcdo. Marchand Quintero llamó a la oficina del Hon. Rivera González para hablar con él y plantearle que tendría que traer a colación en la reunión la información que había recibido. En ese momento

el juez no se encontraba en su oficina, pero su secretaria atendió la llamada. Posteriormente, a la 1:05 p.m. éste devolvió la llamada al Lcdo. Marchand Quintero, quien le comunicó la información que había recibido y que tendría que solicitar su recusación. El Lcdo. Marchand Quintero, "...entendía necesario participárselo de inmediato, a los fines de que el Hon. Rivera González no tuviera que enterarse por primera vez `en frío' en presencia de los demás abogados del pleito y del público en Sala, y para que orientara al Lcdo. Marchand Quintero sobre cómo canalizar el trámite de solicitud de inhibición como juez de la forma menos onerosa posible."

El Hon. Rivera González le manifestó al Lcdo. Marchand Quintero que compareciera a la reunión informal en la que se discutiría lo planteado. Llegado el momento de la reunión informal, el magistrado inició los procedimientos en sala, con todo el personal, a las 4:10 de la tarde, e hizo un récord de la vista.

A continuación se recogen aquellas partes pertinentes de lo acontecido en la vista, según la transcripción, Apéndice, págs. 155-160.

> HON. JUEZ:
> Llámese el caso en calendario.
>
> SEÑORA SECRETARIA:
> (llama el caso de epígrafe)
>
> HON. JUEZ:
> Si son tan amables, identifíquense la compañera y los compañeros para registro.
>
> LCDA. RAMOS DE SZENDREY:
> Buenos Días, Honorable Juez, buenas tardes y demás funcionarios del Tribunal. Mi nombre es Maricarmen Ramos de Szendrey y represento a la parte demandante.
>
> LCDO. ALVAREZ GONZÁLEZ:
> Muy buenas tardes, José Julián Álvarez González, también represento a la parte demandante.
>
> LCDO. MARCHAND QUINTERO:
> Buenas tardes, Vuestro Honor. Soy el Lcdo. Juan R. Marchand Quintero. Nos acompaña el Lcdo. Francisco Ortiz Santini, de nuestra oficina. En representación de los periodistas demandados, El Vocero, Roca y Pursell [sic].
>
> LCDO. SANTIAGO NIEVES:
> Buenas tardes, Juez, funcionarios, compañeros. Juan Santiago Nieves, en unión a José Juan Nazario de la Rosa, por la codemandada, Marta Marrero.

LCDO. SANTIAGO RIVERA:
Buenas tardes, señor juez y demás funcionarios y compañeros. Mi nombre es Héctor Santiago y me represento por derecho propio.

HON. JUEZ:
¿Demandado también?

LCDO. SANTIAGO RIVERA:
Sí, Vuestro Honor, Por eso... ¿Si nos permite, señor Juez?

HON. JUEZ:
Cómo no.

LCDO. SANTIAGO RIVERA:
Yo estuve conversando con los compañeros aquí abogados, que están aquí a mi derecha, y yo quiero, ¿sabe?, que esto... tengo la impresión que usted ha sido el Juez designado para ver el proceso...

HON. JUEZ:
Vamos primero a exponer brevemente... De hecho, recibimos la encomienda por orden administrativa, emitida por el Honorable Carlos Rivera Martínez, Juez Administrador, en la que se señalaba que el caso ha tenido múltiples inhibiciones, señala la orden administrativa y se le asignaba a este Juez por entenderse que en nuestro calendario se podría acomodar el señalamiento del mismo, en aras a una solución justa, rápida y económica del caso. En este caso, el Juez conoce algunas de las partes litigantes. La compañera Iris Meléndez, fue conjuntamente con este Juez, Fiscal, en el Departamento de Justicia, cuando fuimos Fiscales. El compañero abogado, Héctor Santiago, representó en un delito menos grave a un hermano de este Juez.

LCDO. SANTIAGO RIVERA:
Correcto. Hace varios años, sí.

HON. JUEZ:
Hace varios años. El Lcdo. José Juan Santiago, pues, este Juez le ha asignado, inclusive, casos por entender que es muy proeficiente [sic] en el área de lo criminal y en el área de lo civil, inclusive. Sin embargo, en términos de inhibición ninguna de ellas es motivo especificado en reglas, tendría que radicarse una recusación. En la tarde de hoy el Lcdo. Marchand nos llamó y nos participó una conversación exparte [sic]. El Juez quiere saber si quiere reproducirla, ahora que está la compañera y el compañero y si va a hacer alguna solicitud de remedio para canalizar el mismo. De lo contrario, y aún con el relato del compañero, el Juez va a vertir para registro el contenido de esa conversación.

LCDO. SANTIAGO RIVERA:
Sí. Solamente mi intervención, Vuestro Honor, es para informarle algo que conoce mucho el compañero. A mí me une una amistad profunda con su hermano. Fui su representante legal y una persona para mí adorable. Y quiero que todo el mundo lo sepa, para que no haya ningún inconveniente posterior.

HON. JUEZ:
Sí. No, y en eso siempre hemos dicho que podremos juzgar hasta nuestra santa madre y garantizarle, si es en lo criminal, el derecho a un juicio justo y si en lo civil, idem.

LCDO. SANTIAGO RIVERA:
Muy bien.

HON. JUEZ:
Licenciado Marchand Quintero.

LCDO. MARCHAND QUINTERO:
Para efectos de récord, el Lcdo. Juan R. Marchand Quintero. Vuestro Honor, esta mañana, a eso de las 12:05, yo llamé al despacho de Vuestro Honor, no conseguí a nadie. Entonces, lo traté de nuevo como a eso de la una menos veinticinco y su secretaria me indicó que usted estaría de regreso a la 1:00. Puedo estar mal por cinco minutos, pero a la una y cuarto, una y veinte, cojo el teléfono, yo estaba solo en la oficina y era Vuestro Honor. Y le indiqué que esta misma mañana, hoy martes, me indicaron de El Vocero, que se está haciendo una investigación que envuelve las ejecutorias oficiales de Vuestro Honor. Se remontan a cuando usted estaba en la Sala de lo Criminal. Puedo equivocarme, pero estamos hablando de mediados o a fines del '98, hasta mediados del '99. Esa es, por lo que sé, esa es la ventana de estudio. Yo me preocupé, inmediatamente y llamé, hice el contacto, cosa que nunca hago, con los investigadores de El Vocero, que son exNIE y están haciendo ellos la investigación. Por lo que ellos me dijeron, tienen documentos, han hecho entrevistas, tienen fuentes informativas y la investigación está caminando. Yo le indiqué, Vuestro Honor, eso me pone a mí, inmediatamente, a mí como abogado, en una posición que le quise participar y es la siguiente. Primero, por haber gente que sabe que se está investigando, el no publicarse nada con el de venir [sic] del tiempo podría interpretarse como que de alguna forma El Vocero ha tratado con manos de seda o, ¡Vamos!, con algún propósito malo de aventajarse. Y por el contrario, si estuviese el caso activo ante usted y decidiesen publicar lo que sea que decidan publicar, pues, la gente va a pensar, incluyendo obviamente a la parte demandante y su distinguida representación, van a pensar que lo que estamos haciendo es de alguna forma palanqueando el criterio profesional de Vuestro Honor. De esta manera o de otra, es una situación sumamente delicada. Y, en el plano personal, como yo sé que estas cosas suceden, probablemente es a este servidor que le enviarían el producto final, porque es lo usual, de lo que es un borrador de publicación. Si es que lo hacen, es en esa etapa y no antes, que me participarían o me incluirían en el equipo de trabajo para una publicación en específico.
Hablé de esto con mi cliente, con el Sr. Roca, que es parte demandada y tengo las instrucciones de hacer el contacto con usted, el cual hice en la conversación telefónica. Porque no es nuestro propósito tampoco radicar sin prevenir a nadie, sin avisarlo, en una forma, vamos a decir, informar, como lo estamos haciendo, el hecho de que estamos solicitando la recusación.
Pero eso, básicamente, Vuestro Honor, esas son mis instrucciones en este momento, de notificarle al Tribunal, de que dada esta situación, entendemos, lo más sano, lo más sano, saludable, es solicitarle la recusación, cosa que sabemos que bajo la Regla 63 se hace con cierta formalidad. Y como yo le indiqué en la llamada telefónica, yo no tendría reparo alguno en obtener las declaraciones juradas de los que están investigando y poner en un sobre lacrado, en algún sitio donde... en un sitio neutro, no tiene que ser un notario, puede ser el depósito del Tribunal...

HON. JUEZ:
No va a ser necesario.

LCDO. MARCHAND QUINTERO:

... donde sea. Pero es para lo siguiente, Vuestro Honor, porque es una de las causas que nos preocupa, que es, congelar en términos temporales, en otras palabras, en la cápsula del tiempo...

HON. JUEZ:
El derecho de la prensa a informar es expedito, está consagrado en nuestra constitución [sic]. El caso de "New York Times", es el caso "leading" en este tipo de jurisprudencia y eso es prerrogativa de la prensa y en eso no vamos a intervenir y no vamos a pedir ningún tipo de consideración ni judicial, ni personal, ni procesal. ¿Algo más que añadir antes de actuar procesalmente el Tribunal?

LCDO. MARCHAND QUINTERO:
Sabemos, Vuestro Honor, porque usted nos lo indicó, y, además, quiero repetir sus palabras, porque me impactaron mucho, usted nos dijo, que usted no tiene en su memoria evento alguno que se pueda interpretar como que ha actuado mal. Y eso lo quiero consignar en el récord.

Luego de lo antes expuesto, se hicieron los siguientes pronunciamientos por el Hon. Rivera González y el Lcdo. Marchand Quintero:

(Transcripción, Apéndice págs. 160-164)

HON. JUEZ:
Los jueces estamos para ser unos árbitros imparciales y garentes [sic] de derechos de las partes y en ese asunto, que no está "subjudice" ante este Juez, El Vocero, pues, tiene la prerrogativa de informar al pueblo y en eso no podemos intervenir. Sí podemos intervenir en función de la llamada del compañero abogado, porque el tribunal entiende que por su contenido, que básicamente el compañero ha vertido para récord, puede tener un grado mayor de impropiedad. E inclusive, podría entenderse de que en alguna forma bordea en ilicitud con el Artículo 247 del Código Penal, que establece como delito grave, con una pena fija de 6 años, el tratar de influir en un Juez, ya sea con amenazas o por medio de persuación [sic]. Y en ese sentido el Juez lo más que puede hacer es completar lo que dijo el compañero. Aclarar para la transcripción del récord, que la única razón por la cual nos mantuvimos escuchándolo y reaccionamos mínimamente fue porque verdaderamente nos cogió por sorpresa la comunicación del compañero abogado.
De hecho, recuérdese, si no es así, niéguelo para registro, que dijo: "Juez, le quiero adelantar esto porque no lo quiero coger en frío cuando se abra sala".

LCDO. MARCHAND QUINTERO:
Eso es así.

HON. JUEZ:
Pero cuando le participó al Sr. Roca el producto de la conversación que tuve yo con usted, que fue la misma que tuve con todos los otros abogados y abogadas, que le dije que era una reunión de tanteo, que quería evaluar si había posibilidades todavía de transigir las causas de acción, que es básicamente el propósito primordial que tiene este Juez en todos los casos, ve si hay una vía de solución expedita y justa para, sino, calendarizar el caso, pues, el compañero me dijo, que cuando le dijo al Sr. Gaspar Roca, de que el Juez designado era el que está expresándose, él le dijo: "Espérate un segundito, hablamos después, porque creo que tengo

algo! Que ahí fue que le dijo, en una próxima ocasión, de que me estaban investigando. Que la investigación era en cuanto a asuntos judiciales y que tenían que ver con mi función en la Sala Criminal, presumo, de San Juan, porque lo que llevamos es dos años en este salón de sesiones.

El Juez, nos acordamos que le dijimos claramente: "Mire, permítame usar un vocablo muy puertorriqueño, ¡bendito!, yo nunca he hecho en sala, judicial o profesionalmente, nada impropio o ilegal...

LCDO. MARCHAND QUINTERO:
Eso es correcto.

HON. JUEZ:
...que me pueda...¿Fue así, verdad compañero?

LCDO. MARCHAND QUINTERO:
Eso es así. Correctamente.

HON. JUEZ:
Que me pueda equivocar judicialmente, ¡claro! Que pueda tener un juicio errado, ¡claro! Si en primera y última instancia somos unos seres humanos de carne y hueso y en más o menos en una proporción bastante similar. No se espera que los jueces seamos "demiurgos" o semidioses. O sea, los jueces tenemos también los pies de barro y cometemos errores. Pero negligencia con algún grado de intencionalidad, si se me permite la redundancia en derecho, o privar a alguien intencionalmente de un derecho, eso no cabe en este Juez. Que, inclusive, tenemos la carga, y no la rechazamos, de atender todos los casos de confinados en San Juan.

Y queremos llevarlo a registro, porque es indicativo quizás de personalidad jurídica o del ser humano que se está dirigiendo a ustedes, independientemente de la opinión que puedan tener ahora o con posterioridad a cualquier publicación, le hemos dado derecho a vista en todos los casos. En todos los casos. El viernes tenemos treinta casos de confinados. Y lo hacemos porque entendemos que judicialmente se debe atender ese tipo de población.

Que nos equivocamos, licenciado, eso es así. Sin embargo, nos vemos obligados, y como seres humanos no nos gustaría hacerlo, a ordenar la transcripción, a referir el asunto al Supremo y a descalificarlo como abogado de El Vocero. Por otro lado, para que quede en la transcripción, el Juez tiene que señalar, que no tiene prejuicio personal ni prejuicio judicial en cuanto a los hechos del caso, partes o litigantes. Que con independencia de este incidente, este es un asunto en que la jurisprudencia es clara, el peso de la prueba que se le impone a la parte demandante, también es claro y que el Juez lógicamente, no se va a inhibir en este asunto.

Claro, el compañero tiene, no el compañero, porque lo hemos descalificado, algún abogado de el Periódico El Vocero, tendría que presentar la moción solicitando recusación y seguirá el trámite normal.

LCDO. MARCHAND QUINTERO:
Vuestro Honor, ¿puedo interrumpir? Es que me deja atónito, esa es la palabra, el que haber hecho ese acercamiento para un asunto, que bajo la Regla 63 no estaría ante la consideración de Vuestro Honor, sino, de otro magistrado, no se tome como lo que fue, que es una simple cortesía y se toma como si usted me estuviera diciendo, que es lo que yo estoy entendiendo, no lo oigo... de que mi verbalización de esa duda fuese, inclusive, una amenaza, o de alguna forma tratando de influir en la manera en que usted pueda resolver sobre los asuntos de este caso.

HON. JUEZ:

Licenciado, todos ustedes son abogados de experiencia y el Juez también. Y además de experiencia, tenemos calle, tenemos sentido común y los jueces lo utilizan para resolver. El Juez, inclusive, señaló para registro, que de probarse intención criminal pudiera haber una violación al Artículo 247 del Código Penal, "Tratar de influir en Jueces y Jurados". Fíjese que ese artículo utiliza la palabra "persuasión" [sic].

Nos podemos equivocar, nos podemos equivocar, porque como jueces y como seres humanos nos equivocamos. Pero entendemos que lo más correcto no es ver la conversación que tiene exparte el compañero con el Juez como una deferencia, tenemos que verla dentro de la totalidad de las circunstancias. Y estamos solicitando, que si el Tribunal Supremo entiende que ha habido una violación de naturaleza ética por el compañero, o por el Juez, pues, que sea él el que la dirima. Nosotros no somos especialistas en ética profesional.

LCDO. MARCHAND QUINTERO:
Bueno, pero yo quisiera, entonces, que usted consigne, Vuestro Honor, ¿qué expresión en específico le sonó a usted como que era algo... Porque yo fui muy claro. En una expresión yo le dije: "No vamos a entrar en los méritos del caso. Precisamente sobre eso no vamos a hablar".

HON. JUEZ:
En cuanto a los méritos, no se entró.

LCDO. MARCHAND QUINTERO:
Bueno, fíjese...

HON. JUEZ:
En cuanto a si es propia o no la llamada y lo que se expresa en la misma, que básicamente el compañero corroboró lo que él dijo y lo que dijo el Juez, que eso le compete a otra autoridad y no a ésta.

LCDO. MARCHAND QUINTERO:
Pero usted me invitó a que yo hiciera esa locución informal que hemos procedido a hacer. Estoy en lo correcto. Y quiero consignar, le pregunto, ¿si en esa llamada telefónica usted no nos adelantó nada de que usted se sentía como que estaba aludido, persuadido, de alguna manera, amedrentado? No sé, no sé cómo ponerlo en palabras suyas.

HON. JUEZ:
Eso en estos momentos no es prudente que se señale para registro.

LCDO. MARCHAND QUINTERO:
¿Y por qué, Vuestro Honor? O sea, me gustaría que se me diera la oportunidad...

HON. JUEZ:
Porque, licenciado, porque no es prudente, porque ya tomamos dos decisiones, descalificarlo como abogado, uno; y dos, referir el asunto al Tribunal Supremo. Habiéndose referido al Tribunal Supremo por orden, un asunto que puede o no ser ético, pues, huelga el que continúen habiendo explicaciones.

LCDO. MARCHAND QUINTERO:
O sea, ¿ya se refirió?

HON. JUEZ:
Si, esa es la orden de el Tribunal.

LCDO. MARCHAND QUINTERO:

¿No está escrita en el momento?

HON. JUEZ:
No está escrita, lógicamente.

LCDO. MARCHANDO QUINTERO:
¡Okey!

HON. JUEZ:
La orden es de referir el expediente... es la transcripción de lo conversado aquí al Tribunal Supremo para que lo evalúe. Es una orden sobre la cual tan solo [sic] puede solicitarse un remedio por el compañero al Supremo. O sea, no es un tipo de orden que sea apelable al Tribunal de Circuito de Apelaciones. Pero la podemos emitir por escrito, si el compañero así lo desea. Y siéntase en libertad, usted puede estar seguro, de que cualquier información que salga en la presenta, correcta, incorrecta, responsable o menos responsable, va a conturbar el ánimo de cualquier persona. No estamos hablando del Juez. Pero siéntase también con la seguridad, o por lo menos, quien quede representando a El Vocero, si es que luego de los trámites apelativos se mantiene la descalificación, de que este Juez resolverá de acuerdo a prueba y derecho. Otra cosa no vamos a hacer.

LCDO. MARCHAND QUINTERO:
Entonces, esperaremos su orden escrita de descalificación.

HON. JUEZ:
Estamos dándola oralmente desde hoy. La vamos a emitir por escrito mañana. Esperamos que los compañeros y la compañera no tomen este asunto como uno de naturaleza personal. Pero entendemos que después de lo que dijo el compañero, pues, aplica la máxima de que callar otorga. Y como somos fieles defensores...

Como podrá apreciarse de la transcripción anterior, es evidente que la reunión o vista informal señalada para esa tarde tenía como propósito pautar los procedimientos y auscultar la posibilidad de una transacción en el caso. Así lo reconoce el juez en sus expresiones de que se trataba de una "reunión de tanteo, que quería evaluar si había posibilidades todavía de transigir las causas de acción,...." Igualmente, se desprende que el asunto sobre la conversación telefónica entre el juez y el Lcdo. Marchand Quintero fue traída por el primero con el propósito de hacer un récord de lo sucedido. Se desprende, además, de la transcripción, que en forma sumaria el tribunal descalificó al Lcdo. Marchand Quintero de continuar representando a sus clientes, asunto para el cual de acuerdo a sus expresiones, no estaba preparado, ni era el propósito de la reunión.

El 3 de febrero de 2000, el Juez Rivera González emitió una resolución donde recogió las consideraciones de hecho y fundamentos de derecho que lo llevaron a ordenar la descalificación.

Señala la Opinión mayoritaria que "[c]on relación a la descalificación del licenciado Marchand, el Juez explicó que la decretó como una medida preventiva a los fines de continuar el trámite en el caso y de preservar su independencia como juzgador"... y que "[s]e desprende de la resolución, que el Juzgador ofreció especial consideración a la crítica situación de retraso causada por el patrón de inhibiciones de jueces en el caso."[11]

El 16 de febrero, El Vocero presentó petición de *certiorari* ante el Tribunal de Circuito de Apelaciones en la cual planteó que había errado el tribunal de instancia al decretar sumariamente y en corte abierta la descalificación del licenciado Marchand Quintero para continuar representándolo. En esa misma fecha, el foro apelativo intermedio emitió una resolución ordenando la paralización de los procedimientos ante el Tribunal de Primera Instancia y concedió un término de diez (10) días para que cualquier parte interesada se expresase respecto al recurso.

El 14 de marzo el Tribunal de Circuito dictó sentencia mediante la cual revocó la descalificación decretada por el tribunal de instancia. Dicho foro resolvió que la descalificación no se justificaba en los méritos. Además, concluyó que el tribunal de instancia violó el debido proceso de ley tanto del letrado, como de sus representados.

Inconforme, la Fiscal Meléndez Vega acudió ante nos y solicitó la revocación de la sentencia del Tribunal de Circuito y la reinstalación de la orden de descalificación.[12]

---

[11] Opinión mayoritaria, pág. 8

[12] Los errores planteados leen como sigue:

    A.   ERRÓ EL TRIBUNAL DE CIRCUITO DE APELACIONES AL RECONOCER GARANTÍAS DE DEBIDO PROCEDIMIENTO DE LEY ENTERAMENTE INAPLICABLES AL INCIDENTE DE DESCALIFICACIÓN ANTE SÍ,

II

Expresa la Opinión mayoritaria que un acercamiento ex parte de un abogado a un juez, en teoría, podría dar lugar a una descalificación, a un procedimiento disciplinario y a un proceso criminal por violación al Art. 247 del Código Penal y que en el caso de autos, solo resulta relevante examinar los hechos bajo la figura de la descalificación.[13]

Aclara que los procedimientos de descalificación no constituyen acciones disciplinarias, sino una medida preventiva para evitar posibles violaciones a los Cánones de Ética Profesional, según resolvimos en *K-Mart Corp. v. Walgreens of P.R., Inc.*, 121 D.P.R. 633, 637-638 (1988).[14]

Aduce que "[l]os tribunales pueden utilizar la descalificación, además, como mecanismo para asegurar la adecuada marcha de un litigio."

Estamos de acuerdo, desde luego, con esta normativa. Disentimos de la aplicación que hace de ella el Tribunal, ante la situación fáctica del caso de autos.

En primer lugar, no se justifica en modo alguno aplicar la medida extrema de descalificación al Lcdo. Marchand Quintero por razón de la comunicación ex parte sostenida por él con el Juez Rivera González. El Lcdo. Marchand Quintero le explicó al juez el propósito de su llamada –anunciarle de antemano que debido a que su cliente le había informado sobre la publicación futura de unos artículos en el periódico El Vocero sobre las actuaciones del juez en otros asuntos, habría de solicitar su inhibición, lo cual el letrado reiteró luego para el registro en la vista que se celebró a esos fines.

El Canon 11 de Ética Profesional, 4 L.P.R.A. Ap. IX, dispone que "[u]n abogado no debe comunicarse ni discutir con el juez en ausencia de

---

CONCLUYENDO ERRÓNEAMENTE QUE HUBO PRIVACIÓN DE DERECHOS CONSTITUCIONALES DE LOS RECURRIDOS Y SU ABOGADO.

B.   ERRÓ EL TRIBUNAL DE CIRCUITO DE APELACIONES AL RESOLVER QUE LOS HECHOS DEL CASO Y LA DOCTRINA RELACIONADA NO REQUERÍAN LA DESCALIFICACIÓN DECRETADA DEL LCDO. JUAN R. MARCHAND QUINTERO.

[13] Opinión mayoritaria, pág. 10
[14] Id., pág. 11

la otra parte sobre los méritos de un caso pendiente y merece ser reprendido por cualquier acción encaminada a obtener especial consideración personal de un juez."[15]

Claramente, la comunicación ex parte del Lcdo. Marchand Quintero con el Juez Rivera González, según descrita por ambos, nunca versó sobre los méritos del caso de la demandante Iris Meléndez Vega contra El Vocero. Por ende, es improcedente su descalificación por ese fundamento.

En segundo lugar, tampoco en este caso se justifica la descalificación como medida preventiva para evitar posibles violaciones a los Cánones de Ética Profesional. Se justifica la descalificación como medida preventiva para evitar -ordinariamente por razón de conflicto de intereses- que la participación contínua de un abogado en un litigio, permita que se configure en lo sucesivo la violación de los Cánones de Ética Profesional.

En el caso de autos, la descalificación del Lcdo. Marchand Quintero está basada en un hecho ya ocurrido -la comunicación ex parte con el juez para anunciarle la petición de inhibición- por lo que con ella no se está tomando una medida preventiva. No se trata de conducta contínua que habría que prevenir, como la perpetración de un conflicto de intereses u otra conducta similar.

En tercer lugar, tampoco se justifica la descalificación como mecanismo para asegurar la buena marcha de un litigio o evitar "actos disruptivos".

La Opinión mayoritaria pretende justificar la descalificación del Lcdo. Marchand Quintero a base de que el juez de instancia consideró tanto el amplio patrón de inhibiciones en este caso como el considerable atraso que lleva el mismo. No nos persuade.

La parte recurrida ha sometido una tabla como parte de su alegato de réplica[16] de donde surge que se han inhibido en este asunto trece jueces, de los cuales tres pertenecen al nivel de instancia y diez al

---

[15] Véase, *In re Rodríguez Ortiz*, 135 D.P.R. 683 (1994).
[16] Alegato de Réplica de los Recurridos, pág. 18.

nivel apelativo. Cuatro de ellos se inhibieron sin ofrecer explicación; tres de ellos por razón de la participación en el caso de la Lcda. Ramos de Szendrey; uno por el conocimiento personal de algunos testigos de la peticionaria; uno por lazos de amistad con la peticionaria; uno por lazos de amistad con varias de las partes; uno por haber participado en asuntos similares al de autos; uno por la participación del Lcdo. Nazario y otro por lazos de amistad con varios de los abogados. Es obvio que no se puede inculpar al Lcdo. Marchand Quintero de este problema. Además, si el juez de instancia estaba preocupado por la buena marcha del caso y su pronta solución, lo que procedía era, de rehusarse a la inhibición, darle curso a lo dispuesto por la Regla 63 de Procedimiento Civil. Una vez atendido ese incidente, se procedería con el caso. Esta medida no produce una demora mayor en el caso que la demora incurrida por motivo de la descalificación.

En cuanto a evitar posible conducta "disruptiva", no surge de los autos que exista evidencia alguna de que el Lcdo. Marchand Quintero haya incurrido o represente un riesgo de incurrir en ese tipo de conducta, a no ser que se pretenda intimar que la presentación de una solicitud de inhibición constituya tal conducta, lo cual sería un precedente nefasto.

No estamos pasando juicio sobre si la conducta del Lcdo. Marchand Quintero fue o no imprudente y si merece o no algún tipo de sanción disciplinaria. Para ello está pendiente ante nosotros el caso AB-2000-21, consolidado con el AB-2000-14. Lo que entendemos es que la conducta en cuestión no justifica la medida extrema de la descalificación.

En *Sánchez Acevedo v. E.L.A.*, 125 D.P.R. 432 (1990) y en *In re Vélez*, 103 D.P.R. 590 (1975) hemos reconocido el derecho que le asiste a todo ciudadano de escoger libremente el abogado que lo represente. La decisión que emite hoy este Tribunal violenta, sin justificación ni razón válida, este derecho. Confirmaríamos la Sentencia del Tribunal de Circuito de Apelaciones. Por todas las razones anteriormente expuestas, disentimos.

BALTASAR CORRADA DEL RIO
JUEZ ASOCIADO



BALTASAR CORRADA DEL RIO
JUEZ ASOCIADO